[No. 6092–1.    Division One.    January 22, 1979.]

THOMAS E. WOODSON, *Appellant,* v. THE STATE OF WASHINGTON, ET AL, *Respondents.*

*MacDonald, Hoague & Bayless, Robert C. Randolph,* and *Harold H. Green,* for appellant.

*Slade Gorton, Attorney General,* and *Roger A. Gerdes, Assistant,* for respondents.

ANDERSEN, J.—

FACTS OF CASE

The plaintiff, Dr. Thomas E. Woodson, is the holder of what appears to be the only remaining limited osteopathic license in the state. He appeals from the entry of a partial summary judgment declaring that he is not authorized to dispense, prescribe or administer internal medicine or drugs in this state.

The plaintiff operates weight control clinics in Seattle and Everett wherein substantial quantities of ampheta-

mines, related drugs such as phentermine and phendimetrazine, and barbiturates are directly dispensed and administered and also prescribed.

The plaintiff sued John Keith, assistant state attorney general, the State and various state agencies and state officials essentially on the basis that Mr. Keith's legal opinion written to the State Board of Pharmacy led to the plaintiff's February 6, 1973 arrest by federal authorities and seizure of his stock of drugs.[1] The legal opinion expressed by Mr. Keith was that one who holds a limited osteopathic license is not entitled to use drugs in his or her practice. Various federal proceedings brought against the plaintiff, which arose out of the arrest and seizure, terminated in his favor.[2]

One basic issue is dispositive of this appeal.

## ISSUE

Does a limited osteopathic license, as that term is herein defined, authorize its holder to dispense, prescribe or administer internal medicines or drugs in the state of Washington?

## DECISION

CONCLUSION. We hold that it does not and affirm the trial court.

Our state constitution provides:

The legislature shall enact laws to regulate the practice of medicine and surgery, and the sale of drugs and medicines.

---

[1]Since the trial court did not rule on the plaintiff's right to maintain such a cause of action in the first instance, we do not reach that issue here.

[2]Charges that the plaintiff violated federal narcotics law were dismissed by the federal courts. At a hearing to show cause why the drug registration numbers issued to him by the federal Bureau of Narcotics and Dangerous Drugs should not be revoked, a federal hearing examiner vacated the show cause order against the plaintiff noting that his state license or registration had not been suspended, revoked or denied by competent state authority.

Const. art. 20, § 2. As medical science has changed and progressed over the years, so, too, have the state statutes regulating it. The resolution of the issue presented depends primarily on a determination of the intent of the legislatures enacting and changing those statutes.[3] *State v. Houck,* 32 Wn.2d 681, 684, 203 P.2d 693 (1949).

The first statute licensing osteopaths was enacted in 1909. Laws of 1909, ch. 192, § 6, p. 679.

Thereafter, in 1915, one Clyde L. Bonham, an osteopath licensed by the State pursuant to the 1909 enactment, was convicted in King County of the practice of medicine and surgery without a license. That case came about as a result of his performing a tonsillectomy and administering the medication, stypticene, to a patient. In discussing what osteopathy was, the State Supreme Court stated:

> In Funk & Wagnalls New Standard Dictionary of the English Language, the word is defined as follows:
> "A system of treating diseases *without drugs,* propounded by Dr. A. T. Still in 1874. It is based on the belief that disease is caused by some part of the human mechanism being out of proper adjustment, as in the case of a misplaced bone, cartilage or ligament, adhesions or contractions of muscle, etc., resulting in unnatural pressure on or obstruction to nerves, blood, or lymph. Osteopathy, through the agency or use of the bones (especially the long ones which are employed as levers), seeks to adjust correctly the misplaced parts by manipulation."

(Italics ours.) *State v. Bonham,* 93 Wash. 489, 497, 161 P. 377 (1916).

The court in *Bonham* concluded that one who held an osteopathic license at that time was prohibited from

---

[3]Both sides to this controversy rely on differing opinions of the attorney general, formal and informal, and on various administrative practices and interpretations over the years. We have reviewed these and, since they are on both sides of the issue before us, conclude that they are of no more assistance to one side than to the other. In any event, they do not provide an authoritative basis upon which we should decide this case. *Kasper v. Edmonds,* 69 Wn.2d 799, 805, 420 P.2d 346 (1966); *Davis v. County of King,* 77 Wn.2d 930, 933, 468 P.2d 679 (1970). Therefore, they will not be further dealt with herein.

administering internal medication or performing surgery and affirmed the conviction. As there observed,

> it is manifest that the practice of osteopathy, as it was originally understood and as it was understood at the time of the enactment of our medical act, *did not sanction the internal administration of medicines or the surgical use of the knife as a means for curing diseases.* As founded, its principal tenet was the abandonment of these means of cure.

(Italics ours.) *State v. Bonham, supra* at 499. *See* 86 A.L.R. 626 (1933).

Then in 1919, the single license for osteopaths was replaced by a dual system of licensing. Laws of 1919, ch. 4, p. 4. One license was a "certificate authorizing the holder thereof to practice osteopathy" and, in recognition of the changes and developments taking place in the profession, the legislature also provided for a new "certificate authorizing the holder thereof to practice osteopathy and surgery." For clarity, throughout this opinion we refer to the former as a limited osteopathic license and to the latter as a full osteopathic license.

In 1956, the plaintiff obtained, and still possesses, a limited osteopathic license.

Then in 1959, the legislature terminated the issuance of any additional limited osteopathic licenses and specifically authorized holders of full osteopathic licenses to use internal medicines and drugs. Laws of 1959, ch. 110, § 1, p. 625; RCW 18.57.020. Since that time, the distinction between the two kinds of osteopathic licenses has been maintained by the legislature. For example, in this state's Uniform Controlled Substances Act, RCW 69.50, the definition of what a "practitioner" is for the purpose of that act's exemption from registration requirements, includes only persons with full osteopathic licenses and not those with limited osteopathic licenses. RCW 69.50.101(t)(1).

█ Based on our review of the various statutory enactments relating to the profession of osteopathy from the first enactment in 1909 to the present time, we conclude that

the legislative intent was to carry over the original limited concept of osteopathy expressed in *State v. Bonham, supra,* to persons such as the plaintiff herein, who have limited osteopathic licenses. This construction also comports with the view expressed by the State Supreme Court in *State v. Rust,* 119 Wash. 480, 488, 206 P. 33 (1922), which was decided after the creation of the dual system of licensing in 1919:

> The act of 1919 regulating the practice of osteopathy does not define the method or science except by reference. That reference is answered, however, we think, by the case of *State v. Bonham, supra,* and the more recent case of *In re Rust,* 181 Cal. 73, 183 Pac. 548.

*Accord, State v. Houck, supra* at 690–92.

For the foregoing reasons, we agree with the trial court that the plaintiff is not authorized to dispense, prescribe or administer internal medicines or drugs in this state so long as he holds only a limited osteopathic license, nor would he be authorized to practice surgery here.

The plaintiff has vigorously presented specific contentions which merit further answer.

First, the plaintiff quotes the 1919 act wherein it reads:

> That the term osteopathy, as used in this act, shall be held to be the practice and procedure as taught and recognized by the regular colleges of osteopathy.

Laws of 1919, ch. 4, § 17, pp. 16–17. Based on this, and on what is shown by college catalogues as to courses which were taught in osteopathic colleges at that time, he argues that he is authorized to practice anything that was so taught.

It is questionable whether the record in this proceeding establishes that in 1919 the right to administer internal medicine and drugs was both "taught and recognized," as that statute expresses, in regular colleges of osteopathy. In any event, we find persuasive the decision of the Supreme Court of Nebraska wherein, in answering a similar contention, the court said:

The practice authorized must be osteopathic and it must also be as taught in accredited osteopathic colleges. The fact that branches of medicine and surgery may be taught to increase the knowledge of the student in the anatomy and functions of the various parts of the human body for the purpose of better fitting him to practice osteopathy will not warrant him to invade those fields on the theory that they constitute the practice of osteopathy.

*State ex rel. Johnson v. Wagner,* 139 Neb. 471, 478, 297 N.W. 906, 910 (1941). *Accord, State ex rel. Wheat v. Moore,* 154 Kan. 193, 117 P.2d 598, 605–06 (1941); *State v. Baker,* 229 N.C. 73, 48 S.E.2d 61, 65 (1948).

As summed up in *Georgia Ass'n of Osteopathic Physicians & Surgeons v. Allen,* 31 F. Supp. 206, 213 (M.D. Ga. 1940), "[h]is knowledge must be broader than his practice; he must know what he practices but may not practice all he knows." *Accord, State v. Rust, supra* at 489.

██ The plaintiff also quotes the "grandfather" provision from the 1959 enactment. That sentence relating to grandfather rights, together with the sentence which precedes it, reads as follows:

A certificate shall be issued by the director of licenses authorizing the holder thereof to practice osteopathy and surgery, including the use of internal medicine and drugs, and shall be the only type of certificate issued. All certificates to practice osteopathy or osteopathy and surgery, *including the use of internal medicine and drugs,* heretofore issued shall remain in full force and effect.

(Italics ours.) RCW 18.57.020 (part). Based on this, he argues that the italicized phrase "including the use of internal medicine and drugs" in the "grandfather" sentence should be construed as modifying the word "osteopathy" as well as the phrase "osteopathy and surgery;" both of which precede it in that sentence. To so read that sentence would effectively impart the right to use internal medicine and drugs to one holding a limited osteopathic license. Such a reading, however, would violate the statutory rule of construction that

*"Where no contrary intention appears in a statute,* relative and qualifying words and phrases, both grammatically and legally, refer to the last antecedent.
*Martin v. Aleinikoff,* 63 Wn.2d 842, 846, 389 P.2d 422 (1964), quoting *Davis v. Gibbs,* 39 Wn.2d 481, 483, 236 P.2d 545 (1951).

█ Our reading of the last sentence of that portion of RCW 18.57.020, quoted just above, compels us to conclude that the italicized phrase "including the use of internal medicine and drugs" in that sentence modifies only the last antecedent, namely, the term "osteopathy and surgery" (that is, one with a full osteopathic license), and not the term "osteopathy" (that is, one with a limited osteopathic license). *See Caughey v. Employment Security Dep't,* 81 Wn.2d 597, 602, 503 P.2d 460, 56 A.L.R.3d 513 (1972). No contrary intention appears in the statute. In fact, and we feel significantly, the same phrase, "including the use of internal medicine and drugs," is also used immediately following the term "osteopathy and surgery" in the first of the two sentences just quoted, and wherein the separate term "osteopathy" does not even appear.

The judgment of the trial court is affirmed. The stay order pending appeal heretofore entered is dissolved.

FARRIS, C.J., and WILLIAMS, J., concur.

Reconsideration denied March 29, 1979.

Review granted by Supreme Court January 16, 1980.